UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE THOMAS KINKADE COMPANY
f/k/a MEDIA ARTS GROUP, INC., and
RICHARD F. BARNETT,
               Plaintiffs,

v.                                          Case No. 09-10757

LIGHTHOUSE GALLERIES, LLC,         Honorable Patrick J. Duggan
DAVID WHITE, and NANCY WHITE,
               Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on January 27, 2010.

PRESENT:          THE HONORABLE PATRICK J. DUGGAN
                       U.S. DISTRICT COURT JUDGE

The Thomas Kinkade Company and Richard Barnett ("Plaintiffs") filed a Motion to Vacate Arbitration Award in this Court on March 4, 2009. Lighthouse Galleries, LLC, David White, and Nancy White ("Defendants") responded and filed a Cross-Petition to Confirm Arbitration Award on May 26, 2009. The motions have been fully briefed and the Court heard oral argument on July 16, 2009. At the conclusion of the hearing, the parties agreed that it would be prudent to obtain additional information regarding the timing of certain events during the arbitration. The parties made their final submissions to the Court in late November 2009. For the reasons set forth below, the Court vacates the arbitration award.

## I. Facts and Procedural Background

The legal dispute underlying the present motion arises from four Signature Gallery Dealer Agreements ("Dealer Agreements") entered into by the parties between August 1998 and September 1999. These agreements provided the terms and conditions by which Defendants operated galleries selling reproductions of Thomas Kinkade artwork supplied by Plaintiffs. The Dealer Agreements incorporated a document entitled "Media Arts Group, Inc. Standard Terms and Conditions." (Pls.' Mot. Ex. 3.) Paragraph 22 of that document is labeled "Arbitration" and states:

> The parties agree that all disputes between them shall first be submitted for informal resolution to their chief executive officers, or if no chief executive officer, to the owners. Any remaining dispute shall be submitted to a panel of three (3) arbitrators with each party choosing one (1) panel member, and the third panel member being chosen by the first two (2) panel members. The proceedings shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The award of the arbitrators shall include a written explanation of their decision. This arbitration proceeding will be binding upon the parties.

(*Id.*)[1]

The relationship between the parties ultimately soured and this case has been crawling through the court and arbitration systems since April 10, 2002. On that day, Defendants filed a complaint in Wayne County Circuit Court alleging fraud and other claims against Plaintiffs.[2] On June 3, 2002, Plaintiffs initiated arbitration with the

---

[1]In addition to the underlining reflected above, the entire arbitration clause appears in bold, all-caps text in the original document.

[2]Technically, Defendants' state court action was filed against Media Arts Group–predecessor in interest to the Thomas Kinkade Company–and Richard

American Arbitration Association ("AAA") against Defendants alleging breach of contract. About a week later, Plaintiffs moved to dismiss Defendants' state court action in favor of arbitration. Defendants responded to these actions on June 30, 2002, by filing counterclaims in the arbitration proceeding that were identical to their state court claims. On October 4, 2002, Defendants' state court action was dismissed. (Pls.' Mot. Ex. 2.)

In arbitration Plaintiffs selected Burton Ansell ("Ansell") as their party-arbitrator and Defendants selected Mayer Morganroth ("Morganroth").[3] Ansell and Morganroth, in turn, selected Mark Kowalsky ("Kowalsky") as the neutral arbitrator. Pursuant to the parties' agreement, the arbitration was to be governed by California law although the proceeding actually took place in Michigan. (Pls.' Mot. Ex. 3) Ultimately pending before the arbitration panel were Plaintiffs' contract claim and thirteen counterclaims by Defendants.[4]

---

Barnett—Senior Vice President to Media Arts Group and, later, the Thomas Kinkade Company.

[3]Three member arbitration panels like the one provided for in the present agreement are common. In these arrangements, "[t]he members appointed by the parties are theoretically arbitrators, but they advocate the position of the party that appointed them and virtually always cast their votes for their own sides, so that the neutral arbitrator ultimately decides the dispute." *Bhd. of Maint. of Way Employees v. Terminal R.R. Assoc. of St. Louis*, 307 F.3d 737, 739 (8th Cir. 2002); *see also Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617 (7th Cir. 2002) ("[I]n the main party-appointed arbitrators are *supposed* to be advocates.").

[4]A Michigan franchise law claim by Defendants named twelve third-party respondents, none of whom are parties to the present action. Defendants were denied relief on that claim.

3

The arbitration that followed was anything but uneventful.  In late January 2006 Plaintiffs began to suspect that Defendants were somehow obtaining the assistance of a former Thomas Kinkade Company employee and witness in the arbitration proceeding, Terry Sheppard ("Sheppard"), to facilitate the cross-examination of witnesses.  When Plaintiffs' counsel revealed his suspicions to the arbitrators, Defendants' counsel denied the allegations.[5]  After additional inquiry by the arbitrators and an outburst of crying from the court reporter, however, Defendants' counsel was forced to admit that his firm had arranged for a live internet feed of the arbitration transcripts to a laptop possessed by Sheppard in a nearby hotel.  Sheppard would read the real-time transcript and send questions for cross-examination to Defendants' counsel by way of instant messaging.  Defendants first used the live feed in January 2005 and transmitted the transcripts of approximately ten hearing days in all.  (Pls.' Mot. Exs. 79-84.)  In response to these events, Plaintiffs moved to disqualify Defendants' counsel.  The arbitrators denied the motion but indicated that they would impose sanctions for the wrongful conduct.  (Pls.' Mot. Exs. 85-88.)

As the hearings drew to a close at the end of 2006, a new controversy arose regarding Defendants' proofs for causation and damages.  On December 1, 2006, the parties gave closing arguments.  The next day counsel for both parties stated on the record that they had received a fair opportunity to present their cases.  On December 4,

---

[5]Defendants have retained new counsel from a different law firm for the motion presently before the Court.

4

2006, however, the arbitrators—through Kowalsky—requested additional briefing on the issue of causation and an accounting from Defendants regarding the losses claimed.  The next day Plaintiffs complained that the arbitrators' actions amounted to giving Defendants "a second bite at the apple," especially in view of the fact that Plaintiffs had consistently argued a lack of causation and Defendants failed to respond.  Nonetheless, both parties submitted causation briefs as requested by the arbitrators on December 13, 2006, and Defendants submitted a "Profit and Loss" statement on December 22, 2006.  On December 29, 2006, Plaintiffs reiterated their prior objections and noted that Defendants' Profit and Loss statement was unsupported by documentary evidence.  (Pls.' Mot. Exs. 91, 93-98.)

Before any further action was taken regarding causation and damages, issues arose regarding Kowalsky's service as the neutral arbitrator.  On February 8, 2007, Kowalsky and party-arbitrator Morganroth disclosed to the parties that one of Kowalsky's law partners had been retained as a defense expert in a malpractice action pending against Morganroth and Morganroth's firm.[6]  Then, on April 3, 2007, Kowalsky disclosed that another partner in his law firm had been asked to represent Defendant David White in an unrelated NASD arbitration.  Kowalsky assured the parties that he would take action to

---

[6]Although Kowalsky's partner did not ultimately bill much work on the Morganroth account, Kowalsky's partner initially believed that the retention would be a substantial one requiring a fair amount of work and time.  (Schram Dep. at 29.)  Kowalsky was clearly aware of the arrangement because he signed the retention letter on behalf of his partner.  (*Id.* at 25.)

5

prevent his exposure to the subject matter of that arbitration but made no effort to separate himself from the financial benefits that would accompany the representation.

Plaintiffs suspected that these arrangements were influencing Kowalsky's disposition of the causation and damages issues and, on April 20, 2007, they objected to Kowalsky's disclosures.  Shortly thereafter, Kowalsky's partner declined to represent White in the NASD arbitration.  Plaintiffs objected again on May 9, 2007, however, asserting that Kowalsky's disclosure had placed them in the unfavorable position of having to demand that Kowalsky reject a business opportunity.  In early June 2007 Kowalsky disclosed that the partner requested for White's representation had left his law firm.[7]  (Pls.' Mot. Exs. 12, 16-19.)

On July 2, 2007, Plaintiffs filed a motion with the AAA to disqualify Kowalsky. Plaintiffs argued that AAA rules, the AAA Code of Ethics, California law, the California Ethics Standards, and the ABA Model Rules required Kowalsky's disqualification.  In response, Defendants argued that California law required Plaintiffs to direct their disqualification request to Kowalsky rather than the AAA and that disqualification was unnecessary in any event.  On July 30, 2007, Plaintiffs sent a letter to Kowalsky demanding that he disqualify himself.  None of these efforts resulted in Kowalsky's disqualification. (Pls.' Mot. Exs. 20, 26-28.)

---

[7]It is unclear why this disclosure was made given the fact that Kowalsky's law partner had purportedly turned down the representation request a month earlier.

6

As the disqualification issues were wrapping up, the arbitration returned its focus to causation and damages.  On July 6, 2007, Kowalsky ordered that Defendants produce evidence in support of the Profit and Loss statement that had been submitted in December.  On August 9, 2007, Defendants produced approximately 8800 pages of financial documents related to the art galleries.  (Levitt Decl. ¶128.)  On August 21, 2007, Plaintiffs objected to the admission of the documents and sought an order prohibiting Defendants from relying on anything other than their damages expert to prove causation and damages.  (Pls.' Mot. Ex. 99.)

The 8800 documents produced by Defendants in August 2007 had been wrongfully withheld for nearly four and half years.  Plaintiffs originally requested production of all documents related to Defendants damages claims on February 25, 2003.  By April 2, 2004, Defendants' had yet to comply with that request and the arbitrators ordered that Defendants respond to Plaintiffs' damage interrogatories.  On April 22, 2004, Defendants indicated that their damage calculations were not complete but that expert testimony and reports would provide additional information on the more precise calculation of damages. (Pls. Mot. Exs. 76-78.)  Defendants did call a damages expert to testify at the hearings but never provided Plaintiffs with documentary evidence of their damages claims.  For these reasons, Plaintiffs did not have access to the documents in preparing for the arbitration and they were unable to cross-examine witnesses on the documents

throughout the proceedings.[8]  Plaintiffs therefore asserted that admission of the

documents would be unfairly prejudicial.  (*See* Pls.' Mot. Ex. 99.)

On August 29, 2007, the arbitrators denied Plaintiffs' objection and allowed

Defendants to admit the 8800 documents through the testimony of Defendant David

White and Defendants' accountant.  (Levitt Decl. ¶ 130.)  The arbitrators did postpone

cross-examination, however, to allow Plaintiffs time to review the documents.  On

December 7, 2007, Plaintiffs reiterated their objections to the admission of the documents

and then completed their cross-examinations.  (*See* Pls.' Mot. Ex. 100.)  The hearing

day concluded with a new round of closing arguments from the parties.  Thereafter the

arbitrators ordered that the parties submit their final briefs by January 9, 2008, and a list

of pending motions for sanctions and costs by February 18, 2008.  (Pls.' Mot. Exs. 8, 10.)


After nearly six years in arbitration and approximately 50 days of hearings, the

arbitrators issued an "Interim Award of Arbitrators" on May 9, 2008.[9]  The Interim

---

[8]Included in the 8800 documents was evidence that Defendants had paid five
witnesses for their testimony in the arbitration proceeding.  (Pls.' July 21, 2009, Letter,
Exs. 1-5.)  There remains a dispute regarding whether those payments were for testimony
or meant to reimburse the witnesses for expenses incurred as a result of attending the
arbitration hearings.
      Plaintiffs also allege that, if they had earlier access to the 8800 documents, they
could have used them to prove that Defendants' losses at the galleries were caused by
Defendants' own mismanagement.

[9]Relying on AAA rules and California law, Plaintiffs objected on March 20, 2008,
that the arbitrators had lost jurisdiction over the case when they failed to issue an award
within 30 days of the close of the hearings.  (Pls.' Mot. Ex. 11.)

Award concluded that the submitted proofs failed to support Plaintiffs' contract claim but found that Defendants had adequately supported five of their thirteen counterclaims: fraudulent misrepresentation, silent fraud, innocent misrepresentation, breach of contract/violation of the implied covenant of good faith and fair dealing, and tortious interference with business expectations or relationships.[10]  As a result, the arbitrators awarded Defendants $567,300 in damages.  Party-arbitrator Ansell dissented on grounds that Defendants' claims were either time-barred or waived, that Defendants failed to establish causation in support of their claimed damages, and that Plaintiffs had been denied a fair hearing.  (Pls. Mot. Ex. 1.)

The Interim Award left for resolution the "pending costs and sanctions claims" that had been submitted by the parties on February 18, 2008, but otherwise noted that all claims "not expressly granted" were denied.  (*See* Pls. Mot. Exs. 1, 101-102.)  On June 3, 2008, the arbitrators ordered that the parties submit additional applications for "fees and costs."  Although Plaintiffs' objected that any award of fees or pre-judgment interest would violate AAA Rule 46 by contradicting the Interim Award's denial of all claims not expressly granted, Defendants submitted an application for nearly $3.5 million in

---

[10]For each claim, the interim award notes that the claimant alleged proof of the necessary elements and that the respondent denied such proof or asserted an affirmative defense.  These observations are followed by the arbitrators' conclusion that "[t]he proofs submitted supported [or did not support] recovery" on the claim.  No additional explanation was provided.  (Pls. Mot. Ex. 1.)

attorneys' fees and costs and Plaintiffs countered with an opposition brief and an application for over $2 million.  (Pls. Mot. Exs. 1, 108.)

On August 11, 2008, while the issues of costs, sanctions, and fees remained pending, Defendants filed a motion to confirm the Interim Award in this Court. (*Lighthouse Galleries, LLC v. The Thomas Kinkade Company*, No. 08-13466.)  On December 1, 2008, this Court issued an Opinion and Order dismissing the action on grounds that the "Interim Award" was not "final" and, therefore, not subject to confirmation.[11]  (*Id.*, docket entry 15.)

On February 26, 2009, the arbitrators issued a Final Award.  Therein, Defendants were awarded $487,000 in attorney fees, $258,121 in pre-judgment interest, and $215,846.20 in costs.  Defendants were also sanctioned $25,000 for the withheld damage documents and $75,000 for the live internet feed.  Meanwhile, Plaintiffs were awarded $14,054 in costs.  Including the damages award while off-setting the sanctions and Plaintiffs' costs, Defendants' net award amounted to $1,414,213.20.  Once again, party-arbitrator Ansell dissented.  Ansell incorporated by reference his earlier dissent and went on to assert that the award of attorney fees violated AAA Rules 43 and 46.  (Pls. Mot. Ex. 1.)

---

[11]At oral argument in the confirmation proceeding, Defendants' former counsel admitted that he waited 93 days after the Interim Award to file his motion so that Plaintiffs' would be barred from moving to vacate the award.  *See* 9 U.S.C. § 12.

On February 27, 2009, one day after the issuance of the Final Award, Plaintiffs filed a Petition for Vacatur in this Court requesting that the arbitrators' award be vacated in its entirety. As noted above, Plaintiffs then filed the motion to vacate presently pending before the Court on March 4, 2009. Defendants responded and filed a cross-petition to confirm on May 26, 2009.

## II. Applicable Law

As an initial matter, the parties dispute whether this Court should apply California and Ninth Circuit law or Sixth Circuit law. The Dealer Agreements in this case contain a choice of law provision that states: "This AGREEMENT shall be interpreted in accordance with and governed by the laws of the state of California, county of Santa Clara, regardless of the place of its execution or performance." (Pls.' Mot. Ex. 3.) Based on this provision, Plaintiffs argue that this Court should decide the present motion by reference to California and Ninth Circuit law. Defendants argue, however, that California law is only applicable to the merits of the parties' claims.

Despite Defendants' argument to the contrary, California law governed both the merits and procedure of the arbitration in this case. When the issue of Kowalsky's partiality arose during the arbitration, both parties relied on California law to argue for or against disqualification. For this reason, Defendants cannot now disclaim the relevance of California law to procedural issues in the arbitration. *See Speroni, S.P.A., v. Perceptron, Inc.*, 12 Fed. Appx. 355, 358 (6th Cir. 2001).

11

Nonetheless, Plaintiffs' claim that this Court must apply California and Ninth

Circuit law goes too far.  In their own motion, Plaintiffs cite to the Federal Arbitration

Act ("FAA") as the source of this Court's authority to vacate the arbitration award.

When interpreting and applying federal law, this Court is bound by Sixth Circuit

precedent.  To the extent that the arbitrators failed to apply and abide by California law in

conducting the arbitration, such conduct will only be relevant insofar as the FAA or Sixth

Circuit precedent permit vacatur on those grounds.[12]

**III. Vacatur of Arbitration Awards**

The FAA expresses a federal policy favoring the enforcement of arbitration clauses

negotiated between parties to a contract.  *See Volt Info. Sciences, Inc. v. Bd. of Trs.*, 489

U.S. 468, 475-76, 109 S. Ct. 1248, 1254 (1989).  To encourage parties to agree to

arbitration in the first place, the FAA ensures that "arbitration awards are both fair and

final."  *Solvay Pharm. Inc. v. Duramed Pharm, Inc.*, 442 F.3d 471, 475 (6th Cir. 2006).

The act promotes finality "by substantially limiting the occasions for judicial review," *id.*,

and expressing "a presumption that arbitration awards will be confirmed."  *Andersons,

Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 328 (6th Cir. 1998).  At the same time,

however, fairness is achieved "by requiring courts to intervene when arbitrators so

_____

[12]While the Court is bound only by Sixth Circuit (and Supreme Court) precedent,
the opinions of other courts will be referred to where relevant as illustrative or persuasive
authority.  *See Bowling Green v. Martin Land Development Co., Inc.*, 561 F.3d 556, 560
(6th Cir. 2009).

improperly execute their responsibilities as to discourage others from arbitrating in the future." *Solvay*, 442 F.3d at 475.

Pursuant to the FAA, a court may intervene and vacate an arbitration award upon application of any party to the arbitration:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Courts also recognize that judicial intervention may be appropriate where arbitrators act with "manifest disregard for the law."[13]  *See Grain v. Trinity Health*, 551 F.3d 374, 380 (6th Cir. 2008).

In this case, Plaintiffs argue that vacatur is necessary because the neutral arbitrator exhibited evident partiality, the hearings were fundamentally unfair, the arbitrators exceeded the scope of their power, and the arbitrators manifestly disregarded the law.

---

[13]Defendants suggest that, after the Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, --- U.S. ---, 128 S. Ct. 1396, 1406 (2008), "manifest disregard for the law" may no longer provide a separate ground for vacatur. (Defs.' Resp. at 16-17). However, in *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed. Appx. 415 (6th Cir. 2008), a case that post-dates *Hall Street*, the Sixth Circuit vacated an arbitration award on the basis of manifest disregard for the law.

The Court addresses these arguments in the order necessary to ensure the prevention of fruitless proceedings.[14]

## IV. Evident Partiality in the Arbitrators

Plaintiffs argue that vacatur of the arbitration award is mandated by the neutral arbitrator's evident partiality in Defendants' favor. *See* 9 U.S.C. § 10(a)(2). An arbitration award may be vacated on the basis of evident partiality only where "a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989) (quotations omitted). As a result, "[t]he alleged partiality must be direct, definite, and capable of demonstration, and 'the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator.'" *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998) (*quoting Consol. Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995)).

Before an evident partiality claim will be considered by federal courts, however, "a grievant must object to an arbitrator's partiality at the arbitration hearing." *Apperson*, 879 F.2d at 1358-59. In this case, there is no dispute that Plaintiffs met this burden. During the pendency of the arbitration hearings, Plaintiffs requested that the AAA disqualify Kowalsky on the basis of partiality and, when the AAA refused, Plaintiffs demanded that

---

[14]Not all of the grounds for vacatur asserted by Plaintiffs are created equal—some of the grounds, if substantiated, would require that the case be remanded to the original arbitration panel, others would require that the case be remanded to a *new* arbitration panel, and yet others would require complete dismissal of Defendants' claims.

Kowalsky disqualify himself.  Therefore, the issue of Kowalsky's alleged partiality is properly before this Court.

On the unique circumstances of this case, the Court concludes that Plaintiffs have satisfied their burden to establish evident partiality by Kowalsky.  Plaintiffs' allegations of partiality begin with Kowalsky's disclosures regarding the existence or potential existence of business relationships between his law firm and party-arbitrator Morganroth and Defendant David White.  According to Plaintiffs, those disclosures indicate that Kowalsky's conduct in favor of Defendants was improperly motivated by a desire to obtain and promote business relationships for his law firm.  Furthermore, Plaintiffs argue that their objections to and interference with White's representation gave Kowalsky additional motive to rule against them.

Although the content of the disclosures alone would not require a reasonable person to conclude that Kowalsky was partial to Defendants, the timing of the disclosures makes them particularly troublesome.[15]  The events leading to the disclosures in this case apparently did not arise until nearly five years into the arbitration.  When the neutral

---

[15]It is not unusual for courts to dismiss claims of evident partiality on grounds that the business relationship allegedly responsible for the arbitrator's improper motives is too remote in time to have realistically impacted decision-making.  *See, e.g.*, *Apperson*, 879 F.2d at 1360 (discussing a business relationship that ceased over two and a half years before the arbitration hearings).  Because the disclosures in this case involved contemporaneous events, the allegations of partiality cannot be brushed aside so easily. *See, e.g.*, *Britz, Inc. v. Alfa-Laval Food & Dairy Co.*, 40 Cal. Rptr. 2d 700, 707 (Cal. Ct. App. 1195) ("Common sense and experience tell us there is a vast difference between a relationship six years dormant, about which appellants knew, and a current and thriving relationship, about which appellants knew nothing prior to the arbitration.").

arbitrator engages in or attempts to engage in mid-arbitration business relationships with non-neutral participants, it jeopardizes what is supposed to be a party structured dispute resolution process. *Volt*, 498 U.S. at 479, 109 S. Ct. at 1256 ("Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.").

One major benefit of arbitration is that it allows parties to exercise some control over who will resolve their disputes. Because the arbitrators must necessarily be selected before the arbitration begins, mid-arbitration business relationships undermine the ability of the parties to make informed decisions regarding the members of their arbitration panel. In a concurring opinion to the leading Supreme Court case on evident partiality, Justice White observed, "[I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration . . . ." *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring).[16]  Justice White went on to conclude that "[t]he judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality" because "[t]hat role is best consigned to the parties . . . ." *Id.*  Kowalsky's

---

[16]Although Justice Black wrote the plurality opinion in *Commonwealth Coatings*, courts often cite Justice White's concurrence as authoritative because his concurrence appears to reflect the narrower holding on which the six-member majority was able to agree. *See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83 n.3 (2d Cir. 1984).

16

mid-arbitration disclosures, however, made it impossible for Plaintiffs to make an informed decision regarding Kowalsky's partiality until it was too late.

Although Plaintiffs could have unilaterally rejected Kowalsky as the neutral before arbitration began,[17] a party that seeks to disqualify an arbitrator after commencement of the hearings faces an uphill battle. As an initial matter, mid-arbitration disqualification can only be achieved by agreement or approval of the other party to the arbitration, the AAA, or the arbitrator himself. Such agreement is difficult to obtain, however, in light of the fact that mid-arbitration disqualification of the neutral essentially requires the parties to start over with a new panel. In this case, where the disclosures were made five years into the arbitration, such a disqualification would have resulted in a significant loss of time and resources. As a consequence, the AAA and Kowalsky were unlikely to grant Plaintiffs' disqualification motions. *See Britz, Inc. v. Alfa-Laval Food & Dairy Co.*, 40 Cal. Rptr. 2d 700, 710 (Cal. Ct. App. 1195) ("AAA nevertheless is a business enterprise . . . . [and] has its own vested interest in a midarbitration declaration of arbitrator disqualification . . . .").[18] Nonetheless, Plaintiffs had to make the objection if they wished

_____

[17]Technically, party-arbitrator Ansell, rather than Plaintiffs, possessed the authority to reject Kowalsky as the neutral. Because Ansell acted, in effect, as an advocate for Plaintiffs, it is reasonable to believe that his reaction to the disclosures would have mimicked the objections that Plaintiffs made in this case.

[18]Although the California Court of Appeals applies a different "evident partiality" standard than the Sixth Circuit, the observations about the AAA's interest in mid-arbitration disqualifications remain valid and relevant.

to preserve the issue for review, even at the risk of contributing to Kowalsky's disfavor for their cause.

It is with these concerns in mind that the Court turns to other facts cited by Plaintiffs as evidence of partiality.  According to Plaintiffs, the arbitration proceedings and the resulting award in Defendants' favor can only be explained by Kowalsky's bias. Plaintiffs assert that Kowalsky manipulated the proceedings, violated AAA rules, and disregarded applicable law whenever necessary to support Defendants' claims.  In fact, almost every ground for vacatur asserted in Plaintiffs' present motion is also described as a consequence of Kowalsky's partiality.

For example, Plaintiffs argue that Kowalsky intentionally disregarded the notice provision in the parties' contract so Defendants would not be deemed to have waived their claims.  Then, to cover up this transgression, Plaintiffs allege that Kowalsky failed to provide an explanation for the award[19]—a failure that arguably violated the parties' arbitration clause.[20]  Plaintiffs make a similar argument regarding the denial of their

---

[19]*See Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000) ("Arbitrators are not required to explain their decisions. [But] [i]f they choose not to do so, it is all but impossible to determine whether they acted with manifest disregard for the law.").

[20]The arbitration clause requires the arbitrators to provide a "written explanation of their decision."  (Pls.' Mot. Ex. 3.)  Under prevailing Sixth Circuit case law, however, an arbitrator's "explanation" that the submitted proofs simply did or did not support recovery is sufficient.  *See Green v. Ameritech Corp.*, 200 F.3d 967, 976 (6th Cir. 2000) ("[T]he arbitrator was not required by the agreement 'fully' to set forth the facts and his conclusions; the agreement simply called for an explanation. . . . If parties to an arbitration agreement wish a more detailed arbitral opinion, they should clearly state in the agreement the degree of specificity required.").  As noted by the Second Circuit,

contract claim.  Defendants apparently conceded that they ordered and received paintings

for which they never paid.  (Pls.' Mot. Ex. 90.)[21]  Nonetheless, the arbitration award

denies Plaintiffs relief on grounds that "[t]he proofs submitted did not support recovery."

(Pls.' Mot. Ex. 1, Final Award at 2.)  Given these facts, Plaintiffs argue that Kowalsky's

partiality is evidenced by the mere existence of an award in Defendants' favor.

      Another major area of contention is Kowalsky's handling of the causation and

damages portion of Defendants' claims.  Plaintiffs argue that Kowalsky was so

determined to see Defendants succeed that he *sua sponte* re-opened the hearings so that

Defendants could attempt to salvage their claims, allowed the admission of 8800

wrongfully withheld documents even though Plaintiffs could not adequately challenge the

content of the documents at that stage of the proceeding, and then relied on those

---

however, "where a reviewing court is inclined to find that arbitrators manifestly
disregarded the law or the evidence and that an explanation, if given, would have strained
credulity, the absence of explanation may reinforce the reviewing court's confidence that
the arbitrators engaged in manifest disregard."  *Halligan v. Piper Jaffray, Inc.*, 148 F.3d
197, 204 (2d Cir. 1998).  In this case, the absence of an explanation regarding the notice
provision reinforces the Court's confidence that Kowalsky was partial.

      [21]When asked during the arbitration hearing about money owing to Plaintiffs,
Defendant David White declined to commit to a specific dollar amount but did not
otherwise dispute that a debt existed.  Defendants did not address this issue in their
response brief but argued at the July 16, 2009, hearing that the arbitrators may have
rejected Plaintiffs' contract claim on grounds that it was induced by fraud or
misrepresentation.

documents in fashioning relief for Defendants.[22]  Based on these events, Plaintiffs assert

that Kowalsky's bias made the arbitration proceeding fundamentally unfair.

Taken together the aforementioned issues cast a dark shadow over the parties'

arbitration proceeding.  It is not just that Defendants benefitted from a single error of

law;[23] time and again, irregularities in the proceeding favored Defendants.  Given

Kowalsky's mid-arbitration disclosures, these circumstances cannot be blamed on

coincidence alone and a reasonable person would have to conclude that Kowalsky was

partial to Defendants.  Therefore, the arbitration award must be vacated.[24]

## V. Conclusion

Although the FAA substantially limits the occasions for judicial review of

arbitration awards, courts must intervene when arbitrators so improperly execute their

responsibilities as to discourage others from arbitrating in the future.  Considering the

---

[22]Plaintiffs assert, and Defendants do not dispute, that the damage award of $567,300 must have been derived from the withheld documents because Defendants' damages expert failed to offer any testimony to support such an award.

[23]Indeed, there appear to have been at least two errors of law—one regarding notice and another regarding Plaintiffs' contract claim.

[24]The FAA provides, "If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators."  9 U.S.C. § 10(b).  At the July 16, 2009, hearing, Plaintiffs' counsel opined that any time limitations on obtaining arbitration in this case have been tolled by the underlying arbitration and related proceedings.  Because of this, Plaintiffs are *not* requesting that this Court order a new arbitration; rather, Plaintiffs' concede that any of the parties impacted by vacatur could file for a new arbitration if they so desire.  Therefore, instead of requiring that the parties submit to a new arbitration, the Court will leave it to them to decide how they will proceed from here.

entirety of the arbitration proceeding in this case—which includes mid-arbitration disclosures by the neutral of contemporaneous business relationships with non-neutral parties; a post-hearing, arbitrator-initiated second opportunity for Defendants to prove causation and damages with wrongfully withheld documents; and an award that, without explanation, appears to violate the parties' contract and disregard undisputed evidence—intervention is appropriate.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion to Vacate is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Cross-Petition to Confirm is **DENIED**.

A judgment consistent with this opinion shall issue.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Dana N. Levitt, Esq.
Steven Z. Cohen, Esq.